IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

GEORGE TAYLOR,

                        Plaintiff,

        v.

DR. RIBAULT, DR. JAMES MURPHY, SHERYL          OPINION and ORDER
KINYON, JAMIE ADAMS, JACOB CIRIAN, TODD
BRESEE, HOLLY GUNDERSON, CO BIRD, SUMO                22-cv-206-jdp
MEDICAL STAFFING, JAMES FINNELL, MICHAEL
SANDER, CRYSTAL DICKEN, and JOSHUA KOLBO,

                        Defendants.

---

        Plaintiff George Taylor, without counsel, alleges that he has foot problems and that

prison medical staff have provided him with inadequate shoes, which has caused him serious

pain and interfered with his health care and religious practice. Taylor wants athletic shoes from

an outside vendor, which he says are the only shoes that will alleviate his pain.

        Taylor asserts claims under the Eighth Amendment, the First Amendment, the Religious

Land Use and Institutionalized Persons Act (RLUIPA), and Wisconsin negligence law.

Defendants are mostly Department of Corrections employees who worked at Wisconsin Secure

Program Facility (WSPF), where Taylor was incarcerated at most times relevant to this case.

        Defendants move for summary judgment. Dkt. 149; Dkt. 152; Dkt. 159. Defendants

contend that the evidence shows that they had to work within prison security protocols, and

that they devoted a great deal of effort to get Taylor comfortable shoes. That's one reasonable

view of the evidence. But another reasonable view is that the medical care provider defendants,

motivated sometimes by personal hostility, persisted in providing shoes that they knew were

not appropriate for Taylor. The choice between those views of the evidence will have to be

made by the jury, so I will deny the motion for summary judgment on the medical care claims against most of the medical care providers. (I will grant summary judgment on the claim against Dr. Ribault.)

I will grant summary judgment to defendants on the remaining claims, for reasons explained in the opinion. No reasonable jury could find that the security staff significantly interfered with Taylor's health care or his religious practice by requiring him to wear state-issued shoes in certain areas of the prison.

The bottom line is that this case will go to trial on Taylor's Eighth Amendment medical care claims and his Wisconsin law negligence claims against defendants Gunderson, Adams, Kinyon, Dr. Murphy, and Sumo Medical Staffing. Taylor's Eighth Amendment official-capacity claim for injunctive relief against the state will also proceed to trial.

UNDISPUTED FACTS

The following facts are undisputed except where noted.

Taylor has bunions, plantar fasciitis, and posterior tibial tendon dysfunction (PTTD). The PTTD causes Taylor to have severely flat feet. Taylor has been provided with a variety of treatments for these problems, including several pairs of medical shoes and pain medication, but Taylor contends that these treatments have been ineffective. I'll provide an overview of Taylor's shoe experiences here, adding some additional details in the analysis section where details are relevant to the claims.

**A.  DOC policies related to shoes and medical care**

Prison footwear is not merely a medical issue. It also involves prison security, because shoes can be used to conceal contraband, and special shoes can be objects of barter or extortion attempts. So I begin with an overview of Wisconsin DOC policy related to shoes.

**1.  Security policies**

When entering a DOC facility, a prisoner receives state-issued tennis shoes. Prisoners with medical conditions that stop them from wearing state-issued shoes may receive shoes from the Health Services Unit (HSU) based on medical need. Shoes that the HSU provides are called medical shoes and are also considered state-issued shoes.

Visitation is governed by DAI policy 309.06.01. While Taylor was incarcerated at WSPF, this policy required prisoners to wear state-issued shoes to visitation. Personal property is governed by DAI Policy 309.20.03. While Taylor was incarcerated at WSPF, this policy required that personal property be purchased from contracted vendors with limited exceptions.

**2.  Medical policies**

At most times relevant to this case, special needs based on medical necessity were governed by the 2009 version of Policy and Procedure (P&P) 300:07. Dkt. 164-1. Appendix 1 to this policy provided that: (1) if a patient couldn't wear state-supplied footwear because of a significant medical condition, and an off-the-shelf shoe was necessary, the facility must provide an alternative; and (2) those cases were limited and determined on a case-by-case basis through the "established committee/nurse review."

On May 5, 2023, P&P 300:07 was superseded by DAI Policy 500.30.07. Dkt. 129-2. The updated policy restricted shoe orders from HSU to therapeutic medical shoes and custom-

made shoes by an offsite orthotist. Requests for specific name-brand shoes not found in the DOC-approved catalog were not to be granted by medical staff at the institution.

Some deviations from prison policies to address medical needs may be ordered on a short-term basis by HSU staff. But special accommodations for more than 90 days must be reviewed by the institution's Special Needs Committee. Certain special needs, such as a wheelchair and other durable medical equipment, must be approved by the DOC-wide Class III Committee.

**B. Taylor's pre-WSPF care**

Taylor entered DOC custody in 2013. At some point, mostly likely in 2015, Taylor obtained Nike Air Jordan shoes from an outside vendor. Taylor was transferred to Green Bay Correctional Institution (GBCI) in February 2020. While incarcerated at GBCI, Taylor asked medical staff for permission to order athletic shoes from an outside vendor several times. Taylor contended that he had tried several medical shoes from the DOC-approved catalogs without success and needed shoes from an outside vendor to accommodate his custom orthotics. Taylor reported that he did well with Air Jordans, but he didn't receive approval to order shoes from an outside vendor.

**C. Taylor's care at WSPF**

Taylor was transferred to WSPF in June 2021, where most of the events relevant to this case occurred.

**1. The defendants**

Most of the defendants are DOC employees working at WSPF; they are represented by the Wisconsin Department of Justice. Those defendants are:

> Sheryl Kinyon: health services assistant manager at WSPF; sometimes helped cover the health services manager role.

4

Jaime Adams: health services manager at WSPF.

Holly Gunderson: health services nursing coordinator with the Wisconsin Department of Corrections Bureau of Health Services.

Dr. Justin Ribault: a physician out of Racine Correctional Institution; also provided coverage at Prairie du Chien Correctional Institution and WSPF.

Jacob Cirian: a corrections program supervisor at WSPF until March 2022; currently the security director at WSPF.

Todd Bresee: a lieutenant at WSPF until July 2022, then a captain.

Nathan Bird: sergeant at WSPF.

James Finnell: correctional officer at WSPF.

Joshua Kolbo: lieutenant at WSPF.

Crystal Dicken: sergeant at WSPF.

Michael Sander: correctional officer at WSPF.

The other two defendants are Sumo Medical Staffing, a medical employment staffing firm, and Dr. James T. Murphy. Dr. Murphy provided medical care to WSPF prisoners under a contract through Sumo Medical Staffing.

**2. Overview of Taylor's foot-related medical care at WSPF**

Dr. Murphy saw Taylor four times over his first few months at WSPF. At the first visit, Taylor asked Dr. Murphy for permission to order shoes from an outside vendor. Dr. Murphy initially granted that request. But he promptly discontinued it because he found that the DOC-approved vendor of orthotic shoes, Orthofeet, had a Ventura model medical shoe that he believed met Taylor's needs. At later visits, Dr. Murphy told Taylor that the Special Needs Committee would address his shoe concerns, and he ordered naproxen and gabapentin for pain.

5

Dr. Murphy later informed Taylor by letter that he couldn't allow him to order shoes from an outside vendor. Dr. Murphy was not responsible for Taylor's care after September 2021.

In August 2021, the Special Needs Committee denied Taylor's request to order shoes from an outside vendor, explaining only that the request did not "meet criteria as defined in policy." Dkt. 164-2 at 110. Health Services Assistant Manager Kinyon and Health Services Manager Adams sat on the committee. Kinyon, Adams, and Nursing Coordinator Gunderson were involved in Taylor's medical care throughout his incarceration at WSPF.

In November 2021, Dr. Ribault entered a restriction allowing Taylor to wear alternative personal shoes in all areas of WSPF for his comfort unless there was a security concern. A few months later, Kinyon entered a restriction allowing Taylor to wear Biofit medical shoes in all areas of WSPF.

In April 2022, Taylor was sent to an outside podiatrist, Dr. Jacobs, a non-defendant who recommended motion-control athletic shoes. Motion-control shoes have extra arch support in the midsole, added heel cup support, and other features to stop the foot from rolling inward. According to Dr. Jacobs, Taylor could obtain motion-control shoes from Orthofeet. On Dr. Jacobs's suggestion, Dr. Godiwalla (a non-defendant physician at WSPF), Kinyon, and Adams ordered new Orthofeet shoes for Taylor. At Taylor's next appointment, Dr. Jacobs noted that the shoes Taylor was wearing lacked sufficient support, though it's unclear whether Taylor was wearing the new Orthofeet shoes at the time. Dr. Jacobs again recommended motion-control athletic shoes, gave examples of companies that produce them, and stated that they would likely be available only from an outside vendor. Dr. Godiwalla asked the Class III Committee to allow Taylor to buy shoes from an outside vendor, but it denied her request. No defendant sat on the Class III Committee that denied Dr. Godiwalla's request.

6

Dr. Buono, a non-defendant and Associate Medical Director of the DOC, was on the Class III Committee. Dr. Buono, Dr. Godiwalla, Gunderson, and Kinyon decided to order Taylor Orthofeet Sprint shoes from the approved catalog. The Sprint shoes were described as having motion control and a firm heel counter. Several months later, Taylor received custom-made shoes from an offsite orthotist. Taylor expressed dissatisfaction with both the Orthofeet Sprint and custom-made shoes, including after his transfer to Racine Correctional Institution (RCI) in July 2023.

### 3. Shoe-related security incidents

Taylor contends that WSPF security staff sometimes interfered with his wearing of medically approved shoes. Three of these incidents are the basis for Taylor's claims of retaliation and interference with his religious liberty.

#### a. January 14, 2022

Taylor was preparing to go to the visitation area for Friday Jumu'ah service.[1] Lieutenant Bresee noticed that Taylor was wearing personal shoes and told him that, pursuant to WSPF policy, he couldn't wear them to the visitation area. Taylor said that he had a medical restriction to wear personal shoes, but, according to Taylor, Bresee responded that he didn't care. Dkt. 168 ¶ 8; Dkt. 190 ¶ 62; Dkt. 192 ¶ 41. Taylor says that he started to talk to another prisoner about the shoe policy and how Muslims were always treated badly, upon which Bresee said that he could stop talking about the shoe policy and Muslims or go back to his cell. Dkt. 192 ¶ 41. According to Taylor, Bresee was initially going to allow him to attend the religious service but sent him back to his cell for talking about the shoe policy and Muslims,

---

[1] Taylor refers to this service variously as Jumu'ah service, Islamic service, and Islamic studies.

and for threatening to file an inmate complaint. *Id.* Taylor didn't attend Jumu'ah service on that date.

### b. March 26, 2022

On March 26, 2022, Sargeant Bird came to Taylor's unit to escort him to a visit. The parties dispute what shoes Taylor was wearing, although that dispute is immaterial. According to Taylor's version, which I'll accept for purpose of summary judgment, Bird required Taylor to wear non-medical shoes to visitation.

After the incident, WSPF Security Director Cirian issued a memo that clarified that prisoners would not be allowed to wear personal shoes to visitation.

### c. September 13, 2022

Taylor had a medical restriction (valid from February 25, 2022 to February 24, 2023) to wear Biofit shoes in all areas of WSPF, including the visitation area. Prior to a visit, correctional officers Finnell and Sander refused to allow Taylor to attend the visit with the shoes he was wearing. Taylor contends that he was wearing the authorized Biofit shoes; defendants say he was not. The dispute is immaterial. Lieutenant Kolbo told Taylor to return to his cell until a pair of state-issued shoes could be provided. Finnell provided Taylor with state-issued shoes and he attended the visit.

Finnell later issued Taylor a conduct report for disobeying orders, lying, and disruptive conduct for the incident. Taylor denies that conduct.

ANALYSIS

**A. Eighth Amendment medical care claims**

**1. Legal standards**

The Eighth Amendment prohibits prison officials from consciously disregarding the serious medical needs of prisoners. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To establish an Eighth Amendment medical care claim, Taylor must show that he had an objectively serious medical condition that the defendants consciously disregarded. *See Cesal v. Moats*, 851 F.3d 714, 721 (7th Cir. 2017).

Taylor's diagnosed foot conditions, and the persistent pain he contends he suffered from them, could well constitute serious medical needs. *See, e.g., Pearson v. Manlove*, No. 20-cv-487-wmc, 2021 WL 1966601, at *2 (W.D. Wis. May 17, 2021) ("Chronic plantar fasciitis, and the pain associated with it, can rise to the level of a serious medical need . . . ."). The state defendants dispute that Taylor's foot problems are serious medical needs because, among other reasons, he "continues to play basketball, walk and stand without apparent distress, and perform other physical tasks without issue." Dkt. 160 at 20. The matter is genuinely disputed, but for purposes of defendants' summary judgment motions, I'll assume that Taylor's foot problems pose serious medical needs.

Taylor must also show that defendants' medical care, or lack of it, caused him injury. *See Lord v. Beahm*, 952 F.3d 902, 905 (7th Cir. 2020); *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1032 (7th Cir. 2019). Taylor states that: (1) shoes from the approved catalogs were causing his feet to swell, blister, and redden; and (2) his foot pain kept him awake at night, stopped him getting out of bed on some days, and made it difficult for him to walk or work out properly. Dkt. 192 ¶ 13. Taylor received gabapentin and naproxen for pain (though

he contends that those, too, were ineffective), and a nurse diagnosed him with blisters. Dkt. 181-1 at 2–5. I will assume that a reasonable jury could find that the shoes provided to Taylor caused him physical injury.

The real issue on the Eighth Amendment medical care claims is whether any defendant consciously disregarded Taylor's serious medical needs. A defendant consciously disregards an excessive risk to prisoner health if the defendant is aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and the defendant must also draw the inference. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Conscious disregard involves intentional or reckless conduct, not mere negligence. *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010).

A medical professional's decision to ignore a request for medical assistance may show a conscious disregard of medical needs. *Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016) (en banc). As a general rule, when a medical professional is treating a prisoner, she violates the Eighth Amendment only if her treatment decision demonstrates "an absence of professional judgment," that is, that "no minimally competent professional" would have provided that treatment in the circumstances. *See id.*

But if a treatment decision is based on "personal rather than medical reasons," a jury can infer conscious disregard of medical needs. *See Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012); *see also Brown v. LaVoie*, 90 F.4th 1206, 1213 (7th Cir. 2024) (summary judgment improper if jury could find that "personal hostility" or "personal prejudices or animosity" motivated medical professional's treatment decisions).

2. **Gunderson, Adams, and Kinyon**

Taylor proceeds against Nursing Coordinator Gunderson, Health Services Manager Adams, and Health Services Assistant Manager Kinyon based on the allegation that they failed to give him alternative shoes to help his pain. Taylor says that he would have been satisfied with any medical shoes that alleviated his pain, but athletic shoes from an outside vendor are the only shoes that he's identified as having that potential. Taylor also proceeds against Kinyon and Gunderson based on the allegations that they refused to follow Dr. Jacobs's recommendation to let him wear athletic, motion-control, firm-heel-counter shoes.

The undisputed evidence shows that Kinyon, Adams, and Gunderson actively provided and facilitated care for Taylor's foot problems, which included several medical shoe options. *See, e.g.,* Dkt. 190 ¶¶ 189, 215, 218–19, 227, 231, 233–34, 243, 262, 265, 269–70, 272. In determining whether a defendant has consciously disregarded a prisoner's medical needs, I must consider the totality of the care provided. *Petties*, 836 F.3d at 728. The state defendants argue that the totality of the care provided shows that Kinyon, Adams, and Gunderson didn't consciously disregard Taylor's foot problems. They didn't give him the Air Jordans that he wanted, but the Eighth Amendment does not entitle a prisoner to the treatment of his choice. *Cf. Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).

But Taylor contends that Kinyon, Adams, and Gunderson forced him to wear a pair of medical shoes that he had already tried without success and that caused his feet to blister, and they told him that they didn't care if those shoes hurt his feet. Dkt. 192 ¶ 35. Taylor also says that Kinyon, Adams, and Gunderson told him that they: (1) could order shoes from an outside vendor but refused to take that step because they hated his complaints about inadequate medical care; and (2) would document that Taylor's request violated policy as an excuse to

deny it. *See id.* ¶¶ 20, 34. Taylor has submitted declaration evidence that Kinyon, Adams, and Gunderson based their treatment not medical judgment, but on personal hostility. The state defendants dismiss Taylor's statements as "self-serving and implausible." Dkt. 195 at 11 n.3. But these are not appropriate bases to reject Taylor's declaration testimony. *Shaffer v. Lashbrook*, 962 F.3d 313, 317 (7th Cir. 2020).

The state defendants also argue that Kinyon, Adams, and Gunderson lacked the authority to order shoes from an outside vendor because, under HSU policy, HSU staff cannot grant requests for personal shoes that are unavailable in the approved catalogs. Dkt. 195 at 11 n.3; Dkt. 160 at 26–27. But the appendix to the policy states that the Special Needs Committee could authorize the purchase of "off-the-shelf" shoes if the inmate is unable to wear state-issued shoes because of a medical condition. Dkt. 164-1 at 8. Kinyon and Adams were on the Special Needs Committee, Dkt. 197 ¶ 187, so they had the authority to influence the decision whether Taylor would be allowed to order alternative shoes. Dr. Murphy told Taylor that the Special Needs Committee would address his shoe concerns. The fact that Taylor had been allowed to buy Air Jordans sometime after 2013, during which time the relevant version of P&P 300:07 was in effect, is further evidence that DOC policy would have allowed Taylor to get the shoes he wanted.

Gunderson wasn't on the Special Needs Committee. Dkt. 163 ¶ 24; Dkt. 164 ¶ 70; Dkt. 164-2 at 110. But Taylor says that Gunderson (along with Kinyon) deprived him of needed medical care by not following Dr. Jacobs's recommendation. The state defendants contend that Taylor's custom-made shoes had motion control, so Dr. Jacobs's recommendation was met, at least in essence. Dkt. 160 at 4. Both Taylor's custom-made shoes and Orthofeet Sprint shoes were classified as having motion control. But Taylor complained that both of those

shoes were ineffective. Dkt. 190 ¶¶ 247, 259, 262, 281–82, 288, 299, 302–03. A jury could conclude that Dr. Jacobs's recommendation for motion-control athletic shoes from an outside vendor was never strictly met, and that personal hostility toward Taylor motivated Adams's, Gunderson's, and Kinyon's failure to pursue or support that option for consideration by the Special Needs Committee. I will deny the state defendants' motion for summary judgment on these claims.

### 3. Dr. Murphy

Taylor proceeds also against Dr. Murphy, the WSPF doctor contracted through Sumo Medical Staffing. Taylor contends that Dr. Murphy refused to give him alternative treatment for his foot pain. I can infer from Taylor's declaration that he also faults Dr. Murphy for not providing effective pain medication.

The evidence shows that Dr. Murphy provided some treatment for Taylor's foot pain. Dr. Murphy ordered Taylor gabapentin, naproxen, and medical shoes, and told him that the Special Needs Committee would address his request for shoes from an outside vendor. But Taylor states that he explained to Dr. Murphy how shoes from the approved catalogs were harming him, and reported that his naproxen hurt his stomach and was ineffective. Dkt. 192 ¶ 13. Taylor says that Dr. Murphy responded that: (1) he thought Taylor was lying about his foot pain; (2) he didn't care if the medical shoes or naproxen worked; (3) the blisters and redness weren't a big deal; and (4) he wouldn't be providing any further treatment for Taylor's feet. *Id.* ¶¶ 13–14. Taylor contends that, after his last visit with Dr. Murphy, his foot problems started to worsen, which caused him back and knee pain that he didn't previously have. *Id.* ¶ 14.

Dr. Murphy contends that he lacked the authority to authorize shoes from an outside vendor because: (1) DAI Policy 309.20.03 stopped him from taking that action; and (2) the Special Needs Committee was responsible for determining whether that accommodation was appropriate. *See* Dkt. 182 at 4–5. Dr. Murphy is right about his ultimate authority. But even if Dr. Murphy lacked the ultimate decision-making authority, he could have approved or recommended athletic shoes for Taylor. In light of Taylor's evidence of personal animosity, a reasonable jury could conclude that Dr. Murphy did not base his treatment decisions purely on medical judgment. I will deny Dr. Murphy's motion for summary judgment on this claim.

### 4. Bresee, Cirian, and Bird

I allowed Taylor to proceed against Lieutenant Bresee, Security Director Cirian, and Sargeant Bird on an Eighth Amendment claim based on their alleged interference with Taylor's medical care. Dkt. 43 at 7. Taylor alleges that they forced him to wear state-issued shoes to attend medical appointments, visits, and religious services, which caused him pain. The parties dispute whether Taylor had valid restrictions that would have allowed Taylor to wear medical shoes in all areas of the prison. But regardless of these restrictions, Bresee, Cirian, and Bird took actions that resulted in only temporary use of state-issued shoes. Taylor says in his declaration that the state-issued shoes caused "terrible" pain. Dkt. 192 ¶ 26. But that is essentially the same thing that he said about the medical shoes that Dr. Murphy provided him: Taylor says those shoes caused him "extreme" pain. *Id.*, ¶ 10. There is no evidence that a reasonable jury could accept that the short-term use of the state-issued shoes, rather than his authorized medical shoes, posed a risk to Taylor's health or caused him more than minor and temporary discomfort compared to the alternative. I will grant summary judgment to these

14

defendants on Taylor's Eighth Amendment claim against them for interference with medical care.

### 5. Finnell, Sander, Dicken, and Kolbo

Taylor proceeds against Finnell, Sander, Dicken, and Kolbo based on the September 13, 2022, incident in which Taylor was forced to wear state-issued shoes to a visit. Taylor contends that the non-medical state-issued shoes hurt his feet. Again, there is no evidence that the short-term use of the state-issued shoes posed a risk to Taylor's health or caused him anything more than minor and temporary discomfort compared to the alternative. I will grant summary judgment to these defendants on Taylor's Eighth Amendment claim against them for interference with medical care.

### 6. Official-capacity claim against Adams

Taylor proceeds against WSPF Health Services Manager Adams in her official capacity based on the policy that allegedly stopped prisoners from buying shoes from outside vendors. It's unclear whether Taylor is referring to P&P 300:07 (which has been superseded by DAI Policy 500:30.07) or DAI Policy 309.20.03. For purposes of this opinion, I will assume that he is referring to both policies.

"[O]fficial-capacity suits against state officials that seek only injunctive relief are permitted by 42 U.S.C. § 1983." *Power v. Summers*, 226 F.3d 815, 819 (7th Cir. 2000). "The proper defendant in such a suit would be the state officials responsible for seeing that the order is carried out . . . ." *Gray v. McCaughtry*, 72 F. App'x 434, 437 (7th Cir. 2003). If the state official responsible for carrying out the order for injunctive relief no longer works for the prison, the court can substitute the prison official who bears that responsibility. *Gonzalez v. Feinerman*, 663 F.3d 311, 315 (7th Cir. 2011).

As a general rule, a state prisoner's official-capacity claim for injunctive relief becomes moot if the prisoner is transferred to another prison. *See Lehn v. Holmes*, 364 F.3d 862, 871 (7th Cir. 2004); *Higgason v. Farley*, 83 F.3d 807, 811 (7th Cir. 1996). The claim is not moot if the prisoner challenges a statewide policy. *See West v. Grams*, 607 F. App'x 561, 566 (7th Cir. 2015); *Smith v. Reagle*, No. 21-cv-243, 2023 WL 2562275, at *4 (S.D. Ind. Mar. 17, 2023).

Because DAI Policies 309.20.03 and 500.30.07 apply statewide, it's reasonable to infer that they are in effect at RCI. During Taylor's incarceration at RCI, Dr. Ribault told him that ordering shoes from an outside vendor was not an option "per the current policy and is final." Dkt. 190 ¶ 293. The court infers that Dr. Ribault was referring to one or both of these policies. So Taylor's official-capacity medical care claim isn't moot.

I turn to the merits. The state defendants argue that they are entitled to summary judgment on this claim for the same reasons that they are entitled to summary judgment on Taylor's individual-capacity medical care claim against Gunderson, Adams, and Kinyon. Dkt. 160 at 25–26. But I am denying summary judgment on the individual-capacity claims, so this isn't a reason to grant summary judgment on the official-capacity claim.

The plain language of DAI Policies 309.20.03 and 500:30.07 appears to permit staff to order the shoes that Taylor seeks if it were absolutely necessary. But Taylor contends that DOC medical staff have denied him those shoes despite the failure of every other option, in part invoking these policies as a justification. So I will deny summary judgment to the state defendants on this claim. That leaves the issue of which DOC official to substitute for Adams on this claim. I will substitute the acting leader of the DOC, Deputy Secretary Jared Hoy,

because it seems likely that he would have the authority to change or make an exception to the DAI policies at issue.

### 7. Qualified immunity

The state defendants and Dr. Murphy contend that they enjoy qualified immunity. The security staff would have a strong argument that they are entitled to qualified immunity, but I am granting summary judgment on the claims against them on other grounds. So that leaves the claims against Gunderson, Adams, Kinyon, and Dr. Murphy.

In cases like this one, involving a straightforward application of the test for conscious disregard, the court of appeals has been reluctant to find qualified immunity. *E.g., Estate of Clark v. Walker*, 865 F.3d 544, 552–53 (7th Cir. 2017); *Estate of Miller, ex rel. Bertram v. Tobiasz*, 680 F.3d 984, 991 (7th Cir. 2012); *Roe v. Elyea*, 631 F.3d 843, 858 (7th Cir. 2011). Where the plaintiff must prove conscious disregard of his constitutional rights, the merits and the qualified immunity analysis effectively collapse into one question. If there are genuine disputes of fact concerning the elements of an Eighth Amendment claim, the defendant generally cannot avoid trial on the basis of qualified immunity. *Walker*, 293 F.3d at 1037. It is well-established that: (1) medical professionals must treat serious medical problems and base their treatment on medical judgment, not personal reasons; (2) correctional officials cannot intentionally interfere with prescribed treatment. Because a reasonable juror could find that Gunderson,

17

Adams, Kinyon, and Dr. Murphy didn't comply with those requirements, I will deny the state defendants' request for qualified immunity.

## B. Religious liberty claims

### 1. RLUIPA claims

#### a. Bresee and Cirian

Taylor proceeds on a RLUIPA claim against Bresee and Cirian, contending that they stopped him from attending Islamic services by requiring him to wear state-issued shoes that hurt his feet more than his personal shoes did. This claim fails as a matter of law because RLUIPA "does not create a cause of action against state employees in their [individual] capacity." *Grayson v. Schuler*, 666 F.3d 450, 451 (7th Cir. 2012); *see also Vinning-El v. Evans*, 657 F.3d 591, 592 (7th Cir. 2011); *Nelson v. Miller*, 570 F.3d 868, 886–89 (7th Cir. 2009).

I had allowed Taylor to proceed on this claim after the Supreme Court's decision in *Tanzin v. Tanvir*, 592 U.S. 43 (2020), which I reasoned made "the availability of monetary damages in RLUIPA cases . . . an open question." Dkt. 17 at 8. But I later reconsidered that point, concluding that *Tanzin* didn't affect the precedential value of *Grayson*, *Vinning-El*, and *Nelson*. *Russell v. Lange et al.*, 22-cv-333-jdp (W.D. Wis. Jan. 11, 2023), Dkt. 14 at 5; *see also Greene v. Teslik*, No. 21-2154, 2023 WL 2320767, at *2 (7th Cir. Mar. 2, 2023) (holding that "RLUIPA authorizes only injunctive relief against state officials"). I will grant summary judgment to the state defendants on this claim.

#### b. Official-capacity claim against Cirian

Taylor proceeds against Cirian based on the allegation that he implemented DAI Policy 309.06.01, which prohibits the use of personal shoes in the visitation area. Taylor contends that Cirian's strict implementation of this policy stopped him from attending Islamic studies

because his state-issued shoes hurt his feet more than personal shoes. As I explained above, there is no evidence that requiring Taylor to wear state-issued shoes for brief periods caused anything more than temporary discomfort compared to the alternative. This would be sufficient to grant summary judgment on this claim. But there is more.

This claim, if it is based on DAI Policy 309.06.01, is moot. There is a statewide version of DAI Policy 309.06.01, whose latest version became effective on March 20, 2023, and is available on the DOC's website.

The policy that Taylor challenges was implemented with procedures specific to WSPF. Dkt. 167-6 at 1. There is no evidence that the version of DAI Policy 309.06.01 currently in effect at RCI has stopped Taylor from wearing personal shoes to Islamic studies. Even if Taylor were to attend Islamic studies at RCI, the most recent statewide version of this policy doesn't require a prisoner to wear state-issued shoes to visitation. And, even if state-issued shoes are not allowed in visitation at RCI, there's no evidence that Islamic studies are held in that area. Taylor might contend that he's likely to return to WSPF, but no evidence supports this contention. A prisoner's suspicion that he could return to a prison where an unconstitutional policy is in effect fails to show that his claim challenging that policy is not moot. *See West*, 607 F. App'x at 566; *Maddox v. Love*, 655 F.3d 709, 716 (7th Cir. 2011).

I will grant summary judgment to the state defendants on this claim.

**2. First Amendment free exercise claims**

    **a. Bresee and Cirian**

Taylor proceeds against Bresee and Cirian based on the allegation that they stopped him from attending Jumu'ah service by requiring him to wear state-issued shoes that hurt his feet.

To survive summary judgment, Taylor must submit evidence from which a jury could reasonably determine that Bresee and Cirian "personally and unjustifiably placed a substantial burden on his religious practices." *Thompson v. Holm*, 809 F.3d 376, 379 (7th Cir. 2016). A substantial burden puts "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Id.*

Once again, there is no evidence that a reasonable jury could accept that wearing state-issued shoes, rather than his ineffective medical shoes, would cause more than minor discomfort. The court concludes that Taylor has not adduced evidence that Bresee and Cirian imposed a burden on his religious practices. I will grant summary judgment to the state defendants on this claim.

### b.  Official-capacity claim against Cirian

Taylor proceeds against Cirian based on the same allegations underlying his official-capacity RLUIPA claim against him. This claim is moot for the same reasons that Taylor's official-capacity RLUIPA claim against Cirian is moot, and lacks merit for the same reasons that Taylor's individual-capacity First Amendment free exercise claim lacks merit. I will grant summary judgment to the state defendants on this claim.

## C.  First Amendment retaliation claims

Taylor brings retaliation claims against Bresee and Finnell based on the allegation that the forced him to wear the painful state-issued shoes because Taylor had complained about the shoe policy and filed lawsuits.

To prevail on his retaliation claim, Taylor must show that: (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter future First Amendment activity; and (3) the protected activity was at least a motivating factor in

20

defendants' decision to take the retaliatory action. *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009). A deprivation would likely deter future protected activity if it "would likely deter a person of ordinary firmness from continuing to engage in [that] activity." *See Douglas v. Reeves*, 964 F.3d 643, 646 (7th Cir. 2020). The "harsh realities of a prison environment" inform the determination "of what actions are sufficiently adverse." *See Holleman v. Zatecky*, 951 F.3d 873, 880 (7th Cir. 2020).

### 1. Bresee

Taylor says that Bresee forced Taylor to skip Jumu'ah service for complaining about the policy prohibiting the use of personal shoes in the visitation area.

Taylor's alleged threat to file an inmate complaint wasn't protected activity. *Davenport v. Szczepanski*, 704 F. App'x 602, 603 (7th Cir. 2017) ("[M]erely threatening to file a grievance against someone is not protected activity."). But I will assume for purposes of this opinion that direct complaints to Bresee about the policy and perceived mistreatment of Muslims were protected activity. *See* Dkt. 192 ¶ 41.

Taylor's retaliation claim fails on the next element. No reasonable juror could conclude that forcing Taylor to wear state-issued shoes to the visitation area would likely deter a person of ordinary firmness from continuing to complain about the shoe policy or perceived mistreatment of Muslims. A person of ordinary firmness would have nothing to lose by continuing to complain about the policy and its alleged interference with religious practice because the policy doesn't allow prisoners to wear personal shoes to the visitation area in the first place. Dkt. 167-6 at 3; Dkt. 190 ¶ 39.

Taylor contends that Cirian created the policy in response to the January 14, 2022, incident to justify Bresee's alleged deprivation of his federal rights. *See* Dkt. 192 ¶ 28. But the

evidence conclusively shows that the policy was already in place. The policy was updated in 2019, and the memo that Taylor contends proves that Cirian created the policy after the fact itself states that the policy was "not new." Dkt. 167-2; Dkt. 167-4 at 1.

Taylor may be suggesting that there was an informal practice of allowing prisoners to wear personal shoes to the visitation area existed before the incident. But the memo just states that there had "been some recent questions/issues in regards to this procedure." Dkt. 167-2. That hardly shows a practice. Dr. Ribault entered a restriction allowing Taylor to wear personal shoes in November 2021, but it didn't apply if there was a security concern. There is no other evidence showing that Taylor or other prisoners routinely wore personal shoes to the visitation area before the incident.

In sum, there's no evidence of a policy or practice allowing prisoners to wear personal shoes to the visitation area at the time of the incident. Thus, stopping a prisoner from taking that action wouldn't deter an ordinarily firm prisoner from exercising his First Amendment rights. I will grant summary judgment to the state defendants on this claim.

### 2. Finnell

Taylor says that Finnell told him that he couldn't wear his personal shoes to the visitation area because of his lawsuits against prison staff. But Taylor concedes that Finnell didn't tell him that he couldn't wear his personal shoes to visitation because he was filing lawsuits against DOC staff. Dkt. 190 ¶ 126.

Taylor mistakenly believes that I allowed him to proceed on a claim that Finnell *issued him a conduct report* (a distinct retaliatory act) because of his civil rights lawsuits. Dkt. 68 at 7–8; Dkt. 189 at 9; *see* Dkt. 190 ¶ 13; Dkt. 192 ¶ 42. Taylor alleged in a supplement that Finnell told him that he would be getting a conduct report "since [he] plan[ned] on continuing to file

22

lawsuits on [prison staff]," but I didn't allow him to proceed on this bare allegation. Dkt. 62 at 2; Dkt. 68 at 7–8. If Taylor disagreed with that determination, he should have sought reconsideration of the order. *See Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) ("[A] plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment."). I have discretion to treat Taylor's opposition as a motion to amend, but that would be highly prejudicial to defendants considering the number of supplements he has filed and the resources that have been expended on this case. "[W]e are [well past] the point in this case where defendants [became] entitled to know what the scope of the case [was]." *See* Dkt. 146 at 2.

## D. State-law medical negligence claims

Taylor proceeds on a medical negligence claim against Gunderson, Adams, Kinyon, Dr. Murphy, and Dr. Ribault based on the same allegations underlying his Eighth Amendment medical care claims against them. Taylor adds a claim against Sumo Medical Staffing based on its vicarious liability for Dr. Murphy's alleged medical negligence.

### 1. Gunderson, Adams, Kinyon, and Dr. Murphy

Medical negligence is the failure of a medical professional to "exercise that degree of care and skill which is exercised by the average practitioner in the class to which he belongs, acting in the same or similar circumstances." *Sawyer v. Midelfort*, 227 Wis. 2d 124, 149 (1999). Like all negligence claims, a medical negligence claim "requires the following four elements: (1) a breach of (2) a duty owed (3) that results in (4) an injury or injuries, or damages." *Paul v. Skemp*, 2001 WI 42, ¶ 17. "Wisconsin law requires that an expert witness testify to establish the standard of care in a medical malpractice case, unless the situation is one where the

common knowledge of laymen affords a basis for finding negligence." *Wilson v. Adams*, 901 F.3d 816, 823 (7th Cir. 2018).

I will deny summary judgment to Gunderson, Adams, Kinyon, and Dr. Murphy for the same reasons that I denied summary judgment on Taylor's Eighth Amendment medical care claims against them: the evidence supports a reasonable determination that they based their treatment decisions on personal hostility and harmed Taylor as a result. This evidence is enough for a reasonable juror to conclude that these defendants breached a duty that they owed to Taylor and injured him as a result. These defendants contend that Taylor cannot establish the standard of care because he hasn't offered expert medical testimony for that purpose. It is true that expert testimony is generally required to establish the standard of care, but the evidence supports a reasonable determination that Gunderson, Adams, Kinyon, and Dr. Murphy based their treatment decisions on personal hostility, and it's common knowledge that a medical professional has a duty not to provide care on that basis.

## 2. Dr. Ribault

Taylor's failure to submit expert testimony to establish the standard of care precludes his claim against Dr. Ribault. Taylor's proffered experts are Dr. Godiwalla, Dr. Murphy, and Dr. Ribault himself. But Dr. Godiwalla hasn't filed an expert report or declaration, and Dr. Ribault's and Dr. Murphy's declarations don't include any opinion establishing the standard of care for any medical defendant. *See* Dkt. 155 and Dkt. 166; *see also Wilson*, 901 F.3d at 823 (stating that a doctor's report was insufficient to establish the standard of care because it didn't "include any opinion regarding the proper standard of care or whether [another doctor] violated it").

24

Taylor hasn't contended that Dr. Ribault based his treatment decisions on personal hostility or another non-medical motive and, in any case, there's no evidence supporting that contention. It's undisputed that Dr. Ribault's treatment included: asking Taylor for an outside vendor option so he could find a similar option in the approved catalogs; contacting an approved vendor to see if it had wide enough shoes; entering a medical restriction allowing Taylor to wear personal shoes in all areas of WSPF unless there was a security concern; and ordering custom orthotics and pain medication. *See, e.g.*, Dkt 190 ¶¶ 200–01, 204, 207, 252, 268, 286. Dr. Ribault denied Taylor the ability to order athletic shoes from an outside vendor, but that doesn't mean that he based this decision on a non-medical motive.

In short, Taylor needed expert testimony to prove that Dr. Ribault violated the standard of care because "because ordinary laymen would not know what medical treatment was necessary based on the symptoms [Taylor] presented." *See Wilson*, 901 F.3d at 823. I will grant summary judgment to Dr. Ribault on this claim.

### 3.  Sumo Medical Staffing

Under Wisconsin law, an employer is liable for the tortious acts of its employee, if the employee is its "servant." *Pamperin v. Trinity Mem'l Hosp.*, 144 Wis. 2d 188, 198 (1988). "A servant is one who is employed to perform service for another in his affairs and who, with respect to his *physical conduct* in the performance of the service, is subject to the other's control or right to control." *Id.* at 198–99 (emphasis in original). "The right to control is the dominant test in determining whether an individual is a servant." *Id.* at 199. "However, other factors are considered, including the place of work, the time of the employment, the method of payment, the nature of the business or occupation, which party furnishes the instrumentalities or tools, the intent of the parties to the contract, and the right of summary discharge of employees." *Id.*

The parties paint somewhat different pictures of Taylor's relationship with Sumo Medical Staffing, but I will start with Taylor's portrayal. Taylor states that Dr. Murphy told him during his last visit that: (1) he was employed and controlled by Sumo Medical Staffing; (2) he had to do whatever Sumo Medical Staffing said, such as whom to work for or where to work; and (3) he would be fired if he refused Sumo Medical Staffing's orders. Dkt. 192 ¶ 1. Sumo Medical Staffing contends that Taylor isn't competent to testify to these matters. But Dr. Murphy, not Taylor, allegedly made this statement, and Sumo Medical Staffing hasn't contended that he lacks competence to testify about what he heard from Dr. Murphy. Furthermore, it's undisputed that Sumo Medical Staffing paid Dr. Murphy for his work based on timesheets that the DOC provided. Dkt. 176 ¶ 12. This evidence, if believed, is enough to support a reasonable determination that Dr. Murphy was employed by Sumo Medical Staffing and subject to its right to control the performance of his duties.

Some of the undisputed evidence indicates that Sumo Medical Staffing exercised far less control over Dr. Murphy. The chief executive officer of Sumo Medical Staffing, Jeff Parker, states that the company is not involved in "onboarding or orientation, setting a provider's schedule, providing supplies or instruments for use in medical care, directing medical care, or any other aspect of a provider's employment once they are hired by a medical employer." Dkt. 151 ¶ 4. Taylor purports to dispute this proposed fact, but only on the ground that Sumo Medical Staffing paid Dr. Murphy based on timesheets that the DOC provided. Dkt. 176 ¶¶ 8, 12. Put differently, the evidence that Taylor cites doesn't refute Parker's assertion that Sumo Medical Staffing wasn't involved in setting Dr. Murphy's schedule, directing medical care, or any other aspect of his employment after he contracted with the DOC. Along those lines, it's undisputed that Sumo Medical Staffing doesn't maintain records of schedules,

correspondence, or other documents regarding a provider's work at a facility once he is placed. Dkt. 176 ¶ 7. Similarly, it's undisputed that Sumo Medical Staffing doesn't have any records related to Dr. Murphy regarding his clinical or substantive work for the DOC. *Id.* ¶ 11. And Taylor doesn't dispute that the only communication Dr. Murphy had with Sumo Medical Staffing after his placement related to his pay. *Id.* ¶ 13.

Based on these undisputed facts, it's not readily apparent on what basis Dr. Murphy would have concluded that Sumo Medical Staffing employed him and controlled his work. In his own declaration, Dr. Murphy states that Sumo Medical Staffing "had no control over [his] professional medical decision making in [his] day-to-day practice." Dkt. 155 ¶ 8; *but cf. B.A. v. Bohlmann*, No. 09-cv-346-wmc, 2011 WL 13359272, at *6 n.6 (W.D. Wis. Feb. 24, 2011) (a provider's ability to exercise medical judgment "alone is not enough to preclude a finding of an agency relationship"). But, at the summary judgment stage, it's not my role to make credibility determinations or weigh the evidence. *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). The jury must decide whether Dr. Murphy truly told Taylor that Sumo Medical Staffing employed him and controlled his work. Furthermore, in its reply brief, Sumo Medical Staffing failed to point out the ostensible inconsistencies in Taylor's factual averments, much less explain how they preclude this claim. In part because Sumo Medical Staffing hasn't directly addressed key aspects of this claim, I will deny its motion for summary judgment.

## CONCLUSION

To sum up, these claims are going to trial:

- Eighth Amendment medical care claims against Gunderson, Adams, Kinyon, and Dr. Murphy in their individual capacities;

- An Eighth Amendment medical care claim against Hoy in his official capacity;

- Wisconsin-law medical negligence claims against Gunderson, Adams, Kinyon, and Dr. Murphy; and

- A vicarious liability claim against Sumo Medical Staffing based on the alleged medical negligence of Dr. Murphy.

To help Taylor prepare for trial, I will issue in the next few weeks a separate trial preparation order that provides detailed information about how trial works and how Taylor should prepare. Taylor will have to review the trial preparation order carefully and notify defendants' counsel or the court if he has specific questions about preparing for trial.

ORDER

IT IS ORDERED that:

1. Defendant Sumo Medical Staffing's motion for summary judgment, Dkt. 149, is DENIED.

2. Defendant Dr. Murphy's motion for summary judgment, Dkt. 152, is DENIED.

3. The motion for summary judgment of defendants Dr. Ribault, Kinyon, Adams, Gunderson, Bresee, Cirian, Bird, Finnell, Sander, Dicken, and Kolbo, Dkt. 159, is GRANTED in part and DENIED in part, as provided in this opinion and order.

4. The clerk of court is directed to add DOC Deputy Secretary Jared Hoy to the caption.

5. Dr. Murphy's motion to strike any surresponse by plaintiff, Dkt. 194, is DENIED.

6. The clerk of court is directed to set a scheduling conference before Magistrate Judge Crocker.

Entered April 10, 2024.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge